

**Signed February 04, 2016.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 15-30827-HCM |
| CLEAN FUEL TECHNOLOGIES II, LLC, | § | |
|     Alleged Debtor. | § | (Involuntary Chapter 7) |
| | § | |

### MEMORANDUM OPINION REGARDING COUNTERCLAIM

    This case involves an unsuccessful Involuntary Petition filed under Chapter 7 of the Bankruptcy Code against an alleged debtor. The Court previously dismissed the Involuntary Petition, finding that the petitioning creditors did not meet the eligibility requirements established by statute and recent Fifth Circuit precedent. Now, The Empire Strikes Back[1] through a Counterclaim—the alleged debtor seeks recovery of attorney's fees and costs against the unsuccessful petitioning creditors under § 303(i) of the Bankruptcy Code.

    The Court finds that, upon dismissal of an involuntary petition, a presumption arises in favor of awarding attorneys' fees and costs to the alleged debtor. In this case, however, the Court determines, based on the totality of the circumstances, the presumption of an award of attorneys' fees and costs to the alleged debtor has been overcome. As a result, the petitioning creditors in this case have dodged a Bullit[2] and the Counterclaim filed by this alleged debtor must be denied.

---

[1] STAR WARS: EPISODE V – THE EMPIRE STRIKES BACK (Lucasfilm 1980) (Academy Award for Best Sound).

[2] BULLITT (Warner Brothers 1968) (Academy Award for Best Film Editing).

# I.
# INTRODUCTION

## A. Counterclaim

On January 12, 2016, the Court conducted a trial on the Counterclaim (dkt# 55) ("Counterclaim") filed by Clean Fuel Technologies II, LLC ("Clean Fuel2"), as alleged debtor, under § 303(i) of the Bankruptcy Code. The Counterclaim was filed against petitioning creditors E. L. Hollingsworth & Company, Inc. ("ELH"), Pro Tech Diesel, Inc. ("Pro Tech"), TOP Worldwide, Inc. ("TOP"), and Terminal Supply Company ("Terminal Supply") (collectively "Petitioning Creditors").

## B. Jurisdiction

This Court has jurisdiction over the Counterclaim pursuant to 28 U.S.C. §§ 157 and 1334. The Counterclaim arises in and under a bankruptcy case referred to this Court by the Standing Order of Reference entered in this District. The Counterclaim is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court is authorized to enter a final order and judgment with respect to the Counterclaim.

This Opinion constitutes the Court's findings of fact and conclusions of law with respect to the Counterclaim, in accordance with Rules 7052(a)(1) and 9014(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").[3] In reaching its findings and conclusions set forth in this Opinion, the Court has considered and weighed all the evidence, the demeanor and credibility of witnesses, the admitted exhibits, arguments of counsel, and the pleadings and briefs filed by all parties in this case, regardless of whether they are specifically referenced in this Opinion.[4]

# II.
# PROCEDURAL BACKGROUND

## A. Filing of Involuntary Petition

On May 27, 2015, an Involuntary Petition under Chapter 7 of the Bankruptcy Code was filed against Clean Fuel2, as alleged debtor, by the Petitioning Creditors (dkt# 1) ("Involuntary Petition"). Each of the four Petitioning Creditors asserted their eligibility to file the petition under § 303(b) of the Bankruptcy Code.

On June 19, 2015, Clean Fuel2 filed an Answer to the Involuntary Petition (dkt# 5). In its Answer, Clean Fuel2 denied that the Petitioning Creditors were eligible to file the Involuntary Petition, and set forth other allegations as affirmative defenses. On July 2, 2015, the Petitioning Creditors filed a Reply to the Answer (dkt# 21). The

---

[3] To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

[4] Cents (pennies) are intentionally omitted by the Court in the dollar figures used in this Opinion. Sense, however, is not intentionally omitted.

Petitioning Creditors and CleanFuel2 also filed Corporate Ownership Statements (dkt# 17, 18, 19, 20, 22). The Court immediately set a trial on the contested Involuntary Petition for July 16, 2015, consistent with the directive of Bankruptcy Rule 1013(a).

### B. Trial and Dismissal of Involuntary Petition

On July 16, 2015, the Court conducted a trial on the contested Involuntary Petition. At trial on the Involuntary Petition, several witnesses testified and numerous exhibits were admitted into evidence.

On July 20, 2015, the Court delivered its Oral Ruling on the contested Involuntary Petition and dismissed the Involuntary Petition ("Dismissal Ruling"). *See* written transcript of Dismissal Ruling (dkt# 54). On July 20, 2015, the Court entered an Order Dismissing the Involuntary Petition ("Dismissal Order") (dkt# 44). In the Dismissal Order, the Court retained jurisdiction to determine and adjudicate any timely filed counterclaim by Clean Fuel2 against the Petitioning Creditors under 11 U.S.C. § 303(i), and set deadlines for the filing of any counterclaim and an answer to any counterclaim.

### C. Filing and Trial on Counterclaim

On September 29, 2015, Clean Fuel2 timely filed a Counterclaim against the Petitioning Creditors (dkt# 55). In the Counterclaim, Clean Fuel2 requests a judgment against the Petitioning Creditors for reasonable attorneys' fees  and costs incurred in the defense of the Involuntary Petition under 11 U.S.C. § 303(i)(1).

On October 30, 2015, the Petitioning Creditors timely filed their Answer to the Counterclaim (dkt# 56). At a status hearing held on December 10, 2015, respective counsel for Clean Fuel2 and for the Petitioning Creditors requested that an evidentiary trial be set on the merits of the Counterclaim. As a result, the Court set an evidentiary trial on the Counterclaim for January 12, 2016 (dkt# 59).

On January 12, 2016, the Court conducted a trial on the Counterclaim. At the conclusion of trial, the Court took its ruling on the Counterclaim under advisement. This Opinion sets forth the Court's ruling on the Counterclaim.

**III.**
**FINDINGS OF FACT  WITH FACTUAL BACKGROUND**

The Court admitted certain exhibits into evidence at the trial on the Counterclaim on January 12, 2016. The exhibits submitted by Clean Fuel2, as alleged debtor, are referred to herein as "Ex. D-_". The exhibits submitted by the Petitioning Creditors, are referred to herein as "Ex. P-_".

Four witnesses testified in person at trial on the Counterclaim: (1) Mr. Jeff Berlin ("Mr. Berlin"), the Chief Financial Officer of ELH (a petitioning creditor); (2) Mr. Ricardo Rivera ("Mr. Rivera"), the President and owner of Pro-Tech (a petitioning creditor);

(3) Mr. John Warren ("Mr. Warren"), the former Manager of Clean Fuel2 (the alleged debtor); and (4) Mr. Troy Brown ("Mr. Brown"), an attorney for and Vice President of Clean Fuel2. The testimony of Mr. Timothy Harrington ("Mr. Harrington"), the current Manager of CleanFuel2 (the alleged debtor), was received by deposition transcript and admitted at trial on the Counterclaim. *See* Ex. D-36, P-48.

At the trial on the Counterclaim, and upon request, the Court took judicial notice of the prior trial on the Involuntary Petition and of the exhibits admitted at such prior trial.

## A. Clean Fuel2 Formation and Business

Clean Fuel2 (the alleged debtor) was formed in May 2014 as a Texas limited liability company. Clean Fuel2 is governed by an Operating Agreement dated May 29, 2014 ("Operating Agreement"). *See* Ex. P-1. According to the Operating Agreement, CleanFuel2 is a "manager-managed" company. The Manager of Clean Fuel2 from its Inception[5] in May 2014 through March 2015 was Mr. Warren. From March 2015 through the present date, Mr. Harrington has served as the Manager.

Clean Fuel2 has two member owners—Clean Fuel Technologies, LLC ("CleanFuel1") and Trucknology, LLC ("Trucknology"). CleanFuel1 owns an 85% membership interest in CleanFuel2. The owners of Clean Fuel1 include Mr. Warren as well as Mr. Harrington and Mr. Brown, attorneys for CleanFuel2. Trucknology owns the remaining 15% membership interest in CleanFuel2. The owners of Trucknology include Mr. Berlin and Mr. Christopher Shepard ("Mr. Shepard"). Mr. Berlin is the Chief Financial Officer of ELH and Mr. Shepard is the President of ELH. ELH is a large transportation and logistics trucking company headquartered in Michigan. TOP is a wholly owned subsidiary of ELH, and a transportation broker that moves freight.

Clean Fuel2 was formed to develop technology and manufacturing capabilities for "conversion kits" to be installed on diesel trucks. These conversion kits were to be used to convert diesel truck engines so that diesel trucks could run on liquefied natural gas, as well as diesel fuel. Since liquefied natural gas was less expensive than diesel fuel, if successful, these conversion kits could result in fuel cost savings in operating diesel trucks.

Clean Fuel1 is the predecessor to Clean Fuel2. Clean Fuel1 was already engaged in the development of these conversion kits, but lacked sufficient capital to complete what was called Phase 2 of the development process. So, the principals of Clean Fuel1 (Mr. Harrington, Mr. Brown, and Mr. Warren) approached the principals of ELH (Mr. Berlin and Mr. Shepard) in hopes of obtaining additional capital. As a result, Dangerous Liaisons[6] were created when Clean Fuel2 was born in May 2014. Clean Fuel2 was founded with its majority owner being Clean Fuel1 (controlled by Mr. Harrington, Mr. Brown, and Mr. Warren) and its minority owner being Trucknology

---

[5] INCEPTION (Warner Brothers 2010) (Academy Award for Best Achievement in Cinematography).

[6] DANGEROUS LIAISONS (Lorimar Film Entertainment 1988) (Academy Award for Best Costume Design).

(controlled by Mr. Berlin and Mr. Shepard). A conditional Assignment of the assets of Clean Fuel1 to Clean Fuel2 was executed about the same time. *See* Ex. D-1.

Unfortunately, multiple disputes soon arose between the members of Clean Fuel2—Clean Fuel1 (and its principals Mr. Harrington, Mr. Brown, and Mr. Warren) and Trucknology (and its principals Mr. Berlin and Mr. Shepard, who were also officers of creditors ELH and TOP). These disputes included capital contribution requirements referenced in the Operating Agreement and related conditional Assignment of the assets of Clean Fuel1 to Clean Fuel2. Essentially, much of this dispute centered around whether Trucknology satisfied its capital contribution requirements in the amount of $900,000 to Clean Fuel2 as set forth in the Operating Agreement and related Assignment. Trucknology takes the position that it satisfied this contribution requirement by arranging for Clean Fuel2 to enter into a loan agreement with Clean Energy Finance LLC ("Clean Energy Finance") for $925,000. Conversely, Clean Fuel1 takes the position that the Clean Energy Finance loan did not satisfy Trucknology's contribution requirements. Additional disputes arose regarding the quality of the conversion kits delivered by Clean Fuel2 to ELH and installed on diesel trucks operated by ELH, payment of rent by Clean Fuel2 under a sublease with ELH, payment of freight charges owed to TOP, and various other matters.

The short-lived Clean Fuel2 business venture never got off the ground. The Crash[7] of the venture occurred after a controversial meltdown meeting in December 2014. At the meeting, ELH made certain demands regarding defective conversion kits, which Clean Fuel2 disputed. ELH made demand for rent under a sublease of Clean Fuel2's facility located in Vinton, Texas. *See* Ex. P-20. ELH requested a change in the management structure of Clean Fuel2. Mr. Berlin resigned from his position as CFO of Clean Fuel2. A There Will Be Blood[8] attitude quickly developed, with litigation erupting between the parties in various courts, much of which is ongoing.

Clean Fuel2 was no longer operating as a business by the time the Involuntary Petition was filed against it on May 27, 2015. Bank account statements of Clean Fuel2 demonstrated that Clean Fuel2 only had a few hundred dollars in the bank in the months preceding the petition filing, and had received very few deposits and written very few checks. *See* Ex. P-30. Financial statements of Clean Fuel2 showed a loss of $913,229 with liabilities in excess of $1,564,000 and assets of $837,518 for the year ending December 2014. *See* Ex. P-2.

## B. Involuntary Petition Trial and Dismissal Ruling

The Petitioning Creditors filed the Involuntary Petition against Clean Fuel2 on May 27, 2015, and requested the Court to enter an order of relief under Chapter 7 of the Bankruptcy Code against CleanFuel2 (dkt# 1).

---

[7] CRASH (Bob Yari Productions 2004) (Academy Award for Best Picture).

[8] THERE WILL BE BLOOD (Miramax 2007) (Academy Award for Best Achievement in Cinematography).

In the Involuntary Petition, the Petitioning Creditors alleged that the following amounts were owed by Clean Fuel2 under open account balances: ELH asserted a claim of $26,118; TOP asserted a claim of $2,595; Pro-Tech asserted a claim of $113,170; and Terminal Supply asserted a claim of $32,421. *See* Involuntary Petition (dkt# 1, pp. 2-4). The basis for the claims asserted by the Petitioning Creditors against Clean Fuel2 is summarized as follows. ELH asserted claims against Clean Fuel2 based on unpaid rent under a sublease, freight services, and management fees. TOP asserted a claim against Clean Fuel2 based on product shipping costs. Pro-Tech asserted a claim against Clean Fuel2 for diesel mechanic services. Terminal Supply asserted a claim against Clean Fuel2 based on sales of harness products.

The Court conducted a trial on the contested Involuntary Petition on July 16, 2015. Several witnesses—including Mr. Harrington (of CleanFuel1 and CleanFuel2), Mr. Warren (of CleanFuel1 and CleanFuel2), Mr. Berlin (of ELH, TOP, and Trucknology), and Ms. Heather Cordova and Mr. Rivera (of Pro-Tech)—testified at this trial. Numerous exhibits were introduced by both Clean Fuel2 and the Petitioning Creditors.

On July 20, 2015, the Court delivered its Dismissal Ruling and dismissed the Involuntary Petition filed against Clean Fuel2. *See* written transcript of Dismissal Ruling (dkt# 54). In short, the Involuntary Petition was dismissed because the Court determined that the Petitioning Creditors were not eligible to file an Involuntary Petition under 11 U.S.C. § 303(b)(1)—as their claims were the subject of a bona fide dispute. In many respects, the Court's decision to dismiss the Involuntary Petition hinged on the Court's interpretation of the recent Fifth Circuit case of *In re Green Hills Dev. Co., LLC*, 741 F.3d 651 (5th Cir. 2014). In *Green Hills*, the Fifth Circuit found that a bona fide dispute as to the *amount* of a petitioning creditor's claim makes a petitioning creditor ineligible to file an involuntary petition, due to amendments to the Bankruptcy Code. *Green Hills*, 741 F.3d at 657, 660. In so doing, the Fifth Circuit in *Green Hills* seemingly overruled, in part, its precedent in *In re Sims*, 994 F.2d 210, 221 (5th Cir. 1993), where the Fifth Circuit suggested that a bona fide dispute as to the *amount* of a petitioning creditor's claim did not make the petitioning creditor ineligible to file an involuntary petition. *Green Hills*, 741 F.3d at 657.

Here, it appeared to the Court that the claims of the Petitioning Creditors against Clean Fuel2 were the subject of a bona fide dispute as to amount, even if there was no bona fide dispute as to some amount of liability.[9] As a result, the Court dismissed the Involuntary Petition against Clean Fuel2, stating that the dismissal was a "close" and "technical" call for the Court and recognizing that courts are divided over this legal issue. *See* Dismissal Ruling (dkt# 54, pp. 16, 17, 50).

---

[9] The Court dismissed the Involuntary Petition based, in part, on Mr. Warren's testimony on July 16, 2015 that, as Manager of Clean Fuel2, he had not authorized purchases from some of the Petitioning Creditors. *See* Dismissal Ruling (dkt# 54, pp. 32-37, 44-46). Yet, at the subsequent trial on the Counterclaim on January 12, 2016, Mr. Warren testified that he had in fact authorized some purchases.

6

### C. Counterclaim for Attorneys' Fees and Costs

In its Counterclaim against the Petitioning Creditors, Clean Fuel2 seeks an award of attorneys' fees totaling $17,171 and costs totaling $1,880 for defending the Involuntary Petition. *See* Invoices and Receipts at Exs. D-37 and D-39. At the trial on the Counterclaim, CleanFuel2 sought recovery of additional attorney's fees totaling $1,665 for preparation and pursuit of the Counterclaim. *See* Ex. D-38.

The attorneys' fees requested include legal services rendered by both Mr. Brown and Mr. Harrington. *See* Ex. D-37. Mr. Harrington, however, testified at the trial on the Involuntary Petition as a fact witness in his capacity as Manager of Clean Fuel2. He did not serve or appear as an attorney of record for Clean Fuel2 in this bankruptcy case.

Mr. Brown's legal services make up the bulk of the attorneys' fees requested by Clean Fuel2. *See* Exs. D-37 and D-38. Mr. Brown served as the attorney of record for Clean Fuel2 in this bankruptcy case and at the trials on both the Involuntary Petition and on the Counterclaim. Yet, Mr. Brown plays several other roles—Mr. Brown is an officer of Clean Fuel2, an owner of Clean Fuel2 (through Clean Fuel1), and had his law office in Vinton, Texas at Clean Fuel2's place of business (which was subleased by Clean Fuel2 from ELH). Mr. Brown also admitted that he had no written engagement letter for legal services with Clean Fuel2, and that, as of the date of the hearing on the Counterclaim, Clean Fuel2 had not paid him for any legal services.

The costs requested by Clean Fuel2 include reimbursement of airfare for Mr. John Berg (a Vice President of Clean Fuel2) for travel to the trial on the Involuntary Petition. *See* Ex. D-39. Yet, Mr. Berg did not testify and was not called as a witness.

The last time Clean Fuel2 actually conducted any business was in early 2015—many months prior to the filing of the Involuntary Petition. Clean Fuel2 has outstanding debts of more than $100,000, has not paid rent to ELH via the registry of the Texas state court as required by order of the state court, has little money in the bank, has no income, and has had judgments taken against it in various jurisdictions. *See* Ex.D-36, pp. 19-29; Ex.P-29, P-42, P-43, P-45, P-48. Meanwhile, Clean Fuel2 continues to litigate with ELH and TOP (through its owner-attorneys Mr. Brown and Mr. Harrington), despite stating that Clean Fuel2 is unable to pay court fees and costs. *See* Ex. P-40, P-42, P-44, P-45, P-46; Ex.D-36, pp. 28-29.

Clean Energy Finance, a third party that made a secured loan of $925,000 to Clean Fuel2, has not been paid by Clean Fuel2. *See* Ex. D-16; Ex.D-36, pp. 21-22. Clean Energy Finance did not file a UCC-1 Financing Statement and has not perfected its security interest in the assets of Clean Fuel2. *See* Ex. P-47.

According to Mr. Berlin of ELH, Clean Fuel2 still has inventory and equipment sitting in warehouses throughout the country. Mr. Berlin testified that, in his view, the management of Clean Fuel2 is doing nothing to address its liabilities and assets in such warehouses. Mr. Berlin and Trucknology (as a minority member of Clean Fuel2), have

7

no ability to manage or control Clean Fuel2's assets and liabilities since Clean Fuel2 is a manager-managed company. Mr. Harrington (of Clean Fuel1) is currently the Manager of Clean Fuel2—Mr. Warren (of Clean Fuel1) was the previous Manager of Clean Fuel2. Clean Fuel2 is controlled by its majority member (Clean Fuel1), and the principals of such majority member—Mr. Harrington, Mr. Brown, and Mr. Warren. Management of the defunct Clean Fuel2 seems content to just litigate and appeal any adverse rulings rendered against it and to simply ignore its other creditors.

In substance, this is the foundation behind the decision of the Petitioning Creditors to file the Involuntary Petition against Clean Fuel2—they lacked any remedy for The Hurt Locker[10] in which they found themselves. As a result, the Petitioning Creditors filed the Involuntary Petition seeking the appointment of an independent Chapter 7 bankruptcy trustee to collect and liquidate the remaining assets of Clean Fuel2, resolve claims, and pay Clean Fuel2's creditors from such liquidation.

## IV.
## CONCLUSIONS OF LAW WITH LEGAL ANALYSIS

### A. Summary of Counterclaim

The Counterclaim filed by Clean Fuel2 requests the Court to award attorneys' fees and costs against the Petitioning Creditors under § 303(i)(1) of the Bankruptcy Code. The Counterclaim states that Clean Fuel2 "retained counsel and answered and defended" the Involuntary Petition and "incurred costs and reasonable attorneys' fees in the defense" of the Involuntary Petition (dkt# 55). In sum, Clean Fuel2 requests reimbursement of attorneys' fees of $17,171 and reimbursement of costs of $1,880 for defending the Involuntary Petition. Clean Fuel2 also seeks an additional $1,665 in attorneys' fees relating to prosecution of its Counterclaim.

### B. Summary of Petitioning Creditors' Answer and Trial Brief

The Answer to the Counterclaim filed by the Petitioning Creditors contends that they should not be liable for any attorneys' fees or costs incurred by Clean Fuel2 in defense of the Involuntary Petition (dkt# 56). The Petitioning Creditors also specifically object to certain fees and costs requested by Clean Fuel2—such as any attorneys' fees for legal services rendered by Mr. Harrington (since he acted as a fact witness only and not an attorney), and the cost of Mr. Berg's airfare (since he did not testify at trial).

On January 11, 2016, the Petitioning Creditors filed their Trial Brief with respect to the Counterclaim (dkt# 66, 67). In general, the Trial Brief requests the Court to follow a line of cases granting wide discretion to the court in determining whether any award of attorneys' fees is justified under § 303(i)(1) of the Bankruptcy Code. The Petitioning Creditors cite to a number of factors and circumstances in support of their contention that Clean Fuel2 should not be entitled to any award of attorneys' fees and costs.

---

[10] THE HURT LOCKER (Voltage Pictures 2008) (Academy Award for Best Picture).

C. **Analysis of Statute and Case Law Precedent**

Section 303 of the Bankruptcy Code governs involuntary bankruptcy petitions. With respect to the Counterclaim filed by Clean Fuel2 against the Petitioning Creditors, the Bankruptcy Code provides, in relevant part, as follows:

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court *may* grant judgment–
    (1) against the petitioners and in favor of the debtor for–
        (A) costs; or
        (B) a reasonable attorney's fee; or
    (2) against any petitioned that filed the petition in bad faith, for–
        (A) any damages proximately caused by such filing; or
        (B) punitive damages.

11 U.S.C § 303(i) (emphasis added).

Based on the statute, an alleged debtor (like Clean Fuel2) who successfully defends against an involuntary petition *may* be awarded reasonable attorney's fees and costs from the unsuccessful petitioning creditors if three prerequisites are satisfied: (1) the court has dismissed the involuntary petition; (2) the dismissal was not with the consent of the alleged debtor and the petitioning creditors; and (3) the alleged debtor did not waive its right to recovery. In the present case, Clean Fuel2 has met these three statutory prerequisites. The Court dismissed the Involuntary Petition against Clean Fuel2, the dismissal was contested, and Clean Fuel2 has not waived its right to a judgment against the Petitioning Creditors.[11]

So, the three statutory prerequisites to an alleged debtor's right to seek an award of attorneys' fees and costs are clear. However, the use of the discretionary term "may" in § 303(i) has resulted in different analytical approaches being used by the courts to determine when to actually award fees and costs. Although the differences in some of the approaches taken by courts are easily identified, other differences appear more subtle. So far, the Fifth Circuit has not directly addressed the approach to be used in awarding fees and costs under § 303(i) of the Bankruptcy Code.

---

[11] The use of the term "judgment" in 11 U.S.C. § 303(i) may imply that the filing of an adversary proceeding (as opposed to the filing of a motion initiating a contested matter) is necessary for an alleged debtor to obtain an award of fees against unsuccessful petitioning creditors. However, the Fifth Circuit has recently recognized that an award of fees and costs against the signing petitioning creditors may be sought by filing a motion initiating a contested matter. *See In re McMillan*, 614 F. App'x 206, 210 (5th Cir. 2015) (unpublished opinion). This was the procedure used in the instant case. The alleged debtor, Clean Fuel2, filed the Counterclaim initiating a contested matter that requested an award of attorneys' fees and costs under 11 U.S.C. § 303(i) from the signing Petitioning Creditors.

To start, some courts have noted that § 303(i) of the Bankruptcy Code can function as an "automatic" fee-shifting statute. This approach follows the "English Rule"—the loser pays. In simple terms, the unsuccessful petitioning creditor is Unforgiven[12] and must automatically pay the reasonable attorneys' fees and costs of the alleged debtor. *See generally In re Synergistic Tech., Inc.*, 2007 WL 2264700, at *5 (Bankr. N.D.Tex. Aug. 6, 2007); *In re Commonwealth Sec. Corp.*, 2007 WL 309942, at *6 (Bankr. N.D.Tex. Jan. 25, 2007) (discussing this approach). This Court, however, declines to follow the English Rule approach because the Court finds it removes the discretionary term "may" from the language of § 303(i) and erroneously replaces it with the mandatory directive "shall".

In stark contrast, some bankruptcy courts follow an approach where there is not even a presumption of an award of attorneys' fees at all—instead, the court only examines the "totality of the circumstances" in awarding fees under § 303(i) of the Bankruptcy Code. *See e.g., Synergistic Tech.*, 2007 WL 2264700, at *5 ("This court concludes that, with respect to section 303(i)(1) attorney's fee shifting, a court looks at the totality of the circumstances. No presumptions apply one way or another."); *In re Allied Riser Commc'ns Corp.*, 282 B.R. 420, 424 (Bankr. N.D.Tex. 2002) ("The statute does not provide anything more than a grant of authority."). This approach focuses heavily on the discretion implied by Congress's use of the term "may" in § 303(i).

Finally, yet another approach taken by courts with respect to § 303(i) of the Bankruptcy Code harmonizes the two preceding approaches. In general, under this harmonized approach, the courts apply a "presumption" that attorneys' fees will be awarded against unsuccessful petitioning creditors, with the presumption being rebuttable based on the "totality of the circumstances" test. This harmonized "presumption" approach appears to be the majority view (with subtle differences), and has been followed by circuit courts that have addressed the issue. *See e.g., Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 235 (2d Cir. 2015) (supporting citations omitted); *Orange Blossom L.P. v. S. California Sunbelt Developers, Inc. (In re S. California Sunbelt Developers, Inc.)*, 608 F.3d 456, 462 (9th Cir. 2010) (§ 303(i)(1) is a fee-shifting provision that creates a "rebuttable presumption" in favor of an award of attorneys' fees); *Sofris v. Maple-Whitworth, Inc., et. al. (In re Maple-Whitworth, Inc.)*, 556 F.3d 742, 746 (9th Cir. 2009) (dismissal of involuntary petition creates a "rebuttable presumption" that fees will be awarded, which may be overcome by the "totality of circumstances"); *see also In re TRED Holdings, L.P.*, No. 10–40749201 0, WL 3516171, at *7 (Bankr. E.D.Tex. Sept. 3, 2010); (§ 303(i)(1) raises a "rebuttable presumption" that reasonable fees and costs will be awarded and applying the totality of the circumstances test).

Under this "presumption" approach, the unsuccessful petitioning creditors bear the burden of establishing that factors exist that overcome the presumption of awarding fees under § 303(i) based upon the "totality of the circumstances" test. Courts have examined key factors to determine whether the petitioning creditors have overcome the presumption based on the "totality of the circumstances" test. These key factors include:

---

[12] UNFORGIVEN (Warner Brothers 1992) (Academy Award for Best Picture).

(1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the involuntary petition. *See e.g., TPG Troy*, 793 F.3d at 235 (supporting citations omitted); *S. California Sunbelt*, 608 F.3d at 462; *Higgins v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 379 F.3d 701, 707 (9th Cir. 2004). This list of key factors is not exhaustive, and "a bankruptcy court may, in its discretion, choose to consider other material factors it deems relevant." *Vortex Fishing*, 379 F.3d at 708.

This Court finds that the majority "presumption" approach—i.e., that a presumption  exists that an award of attorneys' fees and costs will be made against unsuccessful petitioning creditors, but that the presumption may be rebutted based on the totality of the circumstances—is the most persuasive approach. In this Court's view, the "presumption" approach recognizes the seriousness of filing an involuntary petition by creating a presumption that fees will be awarded against creditors if they are unsuccessful. Yet this "presumption" approach still affords the court discretion on whether to award fees, consistent with the statutory term "may" used in § 303(i). This Court will, therefore, adopt this harmonized "presumption" approach.

Given the subtle differences in even this majority "presumption" approach to awarding fees under § 303(i), the Court will apply the framework recently followed by the Second Circuit in *TPG Troy*. 793 F.3d at 235 (supporting citations omitted). In sum, the framework is as follows: § 303(i) of the Bankruptcy Code creates a "presumption" that fees and costs should be awarded to the alleged debtor if the involuntary petition is dismissed. The presumption of a fee award may be rebutted by the petitioning creditors with evidence that a fee award is not warranted based on the "totality of the circumstances" test. The totality of circumstances test involves a consideration of four key factors, as well as any additional material factors the court chooses to consider and deems relevant. *See e.g., TPG Troy,* 793 F.3d at 235 (supporting citations omitted); *Vortex Fishing*, 379 F.3d at 707-8.[13]

### D. Application of Presumption and Totality of Circumstances Test

At the outset, the Court recognizes that there is a "presumption" in favor of awarding reasonable attorney's fees and costs to Clean Fuel2, since the Involuntary Petition filed by the Petitioning Creditors was dismissed after trial on the merits. The Petitioning Creditors have the burden of rebutting this presumption of an award of fees and costs, based on the totality of circumstances test.

Applying the totality of circumstances test, the Court has considered and evaluates the following factors.

---

[13] A trial court's decision on awarding attorneys' fees and costs under § 303(i) is reviewed on appeal for abuse of discretion. *See e.g.*, *Susman v. Schmid (In re Reid),* 854 F.2d 156, 161 (7th Cir. 1988).

### 1. *Merits of the Involuntary Petition*

First, the Court considers the merits of the Involuntary Petition filed by the Petitioning Creditors against Clean Fuel2. This first factor focuses on the degree to which an involuntary petition, though ultimately unsuccessful, had merit. *See e.g. Susman v. Schmid (In re Reid),* 854 F.2d 156, 161-2 (7th Cir. 1988).

Without doubt, the filing of an involuntary petition is a "severe" and "extreme" remedy that can have serious consequences for an alleged debtor, even if the petition is ultimately dismissed. *See e.g., Green Hills,* 741 F.3d at 655; *In re Tichy Elec. Co., Inc.,* 332 B.R. 364, 372 (Bankr. N.D.Iowa 2005) (supporting citation omitted). As a result, courts expect petitioning creditors to "carefully examine the risks undertaken in the filing of an involuntary petition." *In re Landmark Distrib., Inc.,* 189 B.R. 290, 306 (Bankr. D.N.J. 2005); *see also In re Kidwell,* 158 B.R. 203, 213 (Bankr. E.D.Cal. 1993) (noting that the operative principle behind § 303 is "one who swats at the hornet best kill it").

But, as many courts have recognized, the "closer the question of dismissal, the less likely it may be appropriate to award" attorneys' fees under § 303(i). *See In re DSC, Ltd.,* 387 B.R. 174, 179 (Bankr. E.D.Mich. 2008); *In re Ross,* 135 B.R. 230, 238 (Bankr. E.D.Pa. 1991); *In re Scrap Metal Buyers of Tampa, Inc.,* 253 B.R. 103, 111 (M.D.Fla. 2000) (affirming bankruptcy court's denial of fees in part because "the petition was dismissed by only a narrow margin"); *see also Reid,* 854 F. 2d at 162 (affirming denial of attorneys' fees to debtor, when dismissal was a "close question").

Here, this first factor—the merits of the Involuntary Petition—supports a determination that fees and costs should not be awarded against the Petitioning Creditors. In dismissing the Involuntary Petition against Clean Fuel2, the Court stated that dismissal was a "close" and "technical" call for the Court. *See* Dismissal Ruling (dkt# 54, pp. 16, 17, 50). The Court's decision to dismiss the Involuntary Petition turned, in part, on the Court's interpretation of a recent 2014 decision by the Fifth Circuit in *Green Hills,* 741 F.3d at 657-660. As set forth in more detail above, in *Green Hills,* the Fifth Circuit determined that a bona fide dispute as to the *amount* of a petitioning creditor's claim makes a petitioning creditor ineligible to file an involuntary petition. The Fifth Circuit in *Green Hills* seemingly overruled, in part, its precedent in *In re Sims,* 994 F.2d at 221, which indicated that a bona fide dispute as to the amount of the debt did not make a petitioning creditor ineligible to file a petition. This change in the law was a primary impetus that led the Court to dismiss the Involuntary Petition.

At the same time, the Court recognized and the evidence in this case showed that Clean Fuel2 was not operating as a business at the time the Involuntary Petition was filed. Although perhaps An Inconvenient Truth[14]—it was readily apparent that Clean Fuel2 was a defunct non-operating entity. Clean Fuel2 had very little cash funds and was not paying creditors. *See* Ex. P-4, P-30. Instead, Clean Fuel2 was simply litigating with creditors like ELH, using the legal services provided by its controlling officers and owners, attorneys Mr. Brown and Mr. Harrington, at no real cost to Clean Fuel2.

---

[14] AN INCONVENIENT TRUTH (Lawrence Bender Production 2006) (Academy Award for Best Documentary).

In sum, applying the first factor, the Court concludes that the Involuntary Petition had substantial merit, though technically it was unsuccessful. Therefore, the Court finds that this first factor weighs against the presumption of awarding attorney's fees and costs to Clean Fuel2 under § 303(i) of the Bankruptcy Code.

## 2. *Role of Any Improper Conduct by the Alleged Debtor*

Second, this Court considers the role of any improper conduct on the part of the Clean Fuel2. This second factor focuses primarily on the actions of the alleged debtor preceding and during adjudication of the involuntary petition. For example, if improper conduct by an alleged debtor leads to dismissal of an involuntary petition, courts have denied an award of attorneys' fees to the alleged debtor. *See e.g.*, *Ross*, 135 B.R. at 238; *In re Amburgey*, 68 B.R. 768, 774 (Bankr. S.D.Ind. 1987).

Here, the Petitioning Creditors contend that this second factor weighs against an award of attorneys' fees and costs to Clean Fuel2. In their Trial Brief, the Petitioning Creditors assert that the conduct of Clean Fuel2 demonstrated that it had simply ceased all operations, permitted judgments to be taken against it in Illinois, and had taken little or no action to care for or liquidate any of its tangible assets.

Although these actions and inactions by Clean Fuel2 are relevant with respect to other factors (discussed herein), the Court cannot conclude this is tantamount to "improper conduct" by Clean Fuel2. As a result, this second factor does not rebut the presumption that attorneys' fees and costs should be awarded to Clean Fuel2 under § 303(i)(1).

## 3. *Reasonableness of Actions Taken by Petitioning Creditors*

Third, this Court considers the reasonableness of the actions taken by the Petitioning Creditors. This third factor examines whether the Petitioning Creditors were reasonable in the filing and pursuit of the Involuntary Petition against Clean Fuel2. "Creditors are justified in filing an involuntary bankruptcy against a debtor where exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to insure an orderly ranking of creditors' claims and to protect against other creditors obtaining a disproportionate share of debtor's assets." *In re Hentges*, 351 B.R. 758, 772 (Bankr. N.D.Ok. 2006); *see also Allied Riser*, 238 B.R. at 424. In addition, a court may find that the petitioning creditors acted reasonably when such actions were taken to prevent "future transfers or wasting or dissipation of assets or to investigate and challenge the legitimacy of entities that may be operating as alter egos of the debtor." *In re Hentges*, 351 B.R. at 772.

Here, the Court finds that the Petitioning Creditors acted reasonably in filing and pursuit of the Involuntary Petition. The Involuntary Petition was filed against Clean Fuel2 under Chapter 7 of the Bankruptcy Code, in the hope that a Chapter 7 bankruptcy trustee might serve as an unbiased administrator of any remaining Clean Fuel2 assets and claims. As an independent party, a Chapter 7 trustee could assess, collect, and

liquidate the assets of Clean Fuel2 for the benefit of all creditors. The potential benefit of a Chapter 7 orderly liquidation of Clean Fuel2 is evident, given the apparent location of Clean Fuel2 tangible assets in various states and apparent lack of oversight over the assets by existing management of Clean Fuel2. The Petitioning Creditors also rightfully believed that adjudicating all claims of creditors against Clean Fuel2 in a single forum (the bankruptcy court) with an independent bankruptcy trustee, represented the most logical and orderly means of treating all creditors fairly and equally.

If the Involuntary Petition was granted, an independent bankruptcy trustee for Clean Fuel2 could have investigated several transactions involving Clean Fuel2, such as the conditional Assignment of assets from Clean Fuel1 to Clean Fuel2. A Chapter 7 bankruptcy trustee could also have used bankruptcy powers for the benefit of all creditors, such as possible recovery of allegedly improper transfers of funds of Clean Fuel2, and potential avoidance of the unperfected security interest held by Clean Energy Finance in the assets of Clean Fuel2 under § 544 of the Bankruptcy Code.

The evidence also demonstrated that Clean Fuel2 had not operated as a business since early 2015—several months before the Involuntary Petition was filed. Clean Fuel2 had only a few hundred dollars in the bank in the months preceding the Involuntary Petition and had received very few deposits and written very few checks. The existing management of Clean Fuel2 appeared unconcerned with the Gravity[15] of its dire financial condition and had taken little or no real action to address the collection and liquidation of its remaining tangible assets and pay creditors.

In sum, applying the third factor, the Court concludes that the actions of the Petitioning Creditors in the filing and pursuit of the Involuntary Petition against Clean Fuel2 were reasonable. This third factor weighs against the presumption of awarding attorneys' fees and costs to Clean Fuel2.

### 4. *Motivation and Objectives Behind Involuntary Bankruptcy Filing*

Fourth, this Court considers the motivation and objectives of the Petitioning Creditors in filing the Involuntary Petition. This fourth factor, while similar to the first and third factors, focuses on a subjective and objective assessment of the motivations of petitioning creditors in filing an involuntary proceeding. *See e.g.*, *Vortex Fishing*, 379 F.3d at 707-8 (supporting citations omitted).

Here, the Court concludes that the Petitioning Creditors were motivated by the desire to have an independent Chapter 7 trustee appointed to collect and liquidate Clean Fuel2's remaining assets, adjudicate and resolve the claims of all creditors in one forum, and distribute the proceeds fairly to all creditors. For example, Mr. Berlin testified that Clean Fuel2 was involved in litigation with unpaid creditors in numerous venues. This statement was effectively confirmed by the documentary evidence and the testimony of the current manager of Clean Fuel2 (Mr. Harrington). Mr. Berlin also testified that Clean Fuel2 had inventory located in warehouses around the country, with

---

[15] GRAVITY (Warner Brothers 2013) (Academy Award for Best Achievement in Cinematography).

little or no ability (or inclination) to collect and liquidate such assets. Mr. Berlin and Trucknology (as a minority member of Clean Fuel2), do not have the ability to manage or control Clean Fuel2's assets and liabilities, as Clean Fuel2 is a manager-managed company. Absent Chapter 7 bankruptcy, the Manager of Clean Fuel2 (currently Mr. Harrington) and its majority member Clean Fuel1 (controlled by Mr. Harrington, Mr. Brown, and Mr. Warren) remain in control of Clean Fuel2's remaining assets and liabilities.

At the trial on the Counterclaim, Clean Fuel2 argued that the filing of the Involuntary Petition was in bad faith, as it represented a "hostile takeover" attempt by the Petitioning Creditors—two of which are affiliated with Trucknology (a minority owner of Clean Fuel2). This argument reflects a basic misunderstanding of the Bankruptcy Code. The Involuntary Petition was filed against Clean Fuel2 under Chapter 7 of the Bankruptcy Code. If successful, an independent Chapter 7 trustee would have been appointed for Clean Fuel2. The bankruptcy trustee (not the Petitioning Creditors or Trucknology) would have taken exclusive control over the assets of Clean Fuel2. *See* 11 U.S.C. § 704. Indeed, transactions between Clean Fuel2 and the Petitioning Creditors, Trucknology and Mr. Berlin (as well as principals of Clean Fuel1), would be subject to examination and investigation by an independent Chapter 7 trustee.

Based on the record, the Court finds that the subjective and objective motives of the Petitioning Creditors in filing the Involuntary Petition against Clean Fuel2 were appropriate, reasonable, and in good faith. It must be recognized that a finding of bad faith by petitioning creditors is not required to award attorneys' fees and costs under § 303(i)(1) of the Bankruptcy Code. *See TPG Troy,* 793 F.3d at 235 (supporting citations omitted); *S. California Sunbelt*, 608 F.3d at 462; *Commonwealth Sec. Corp.*, 2007 WL 309942, at *6. A finding of bad faith in filing the involuntary petition is only required if an award of actual and punitive damages is made against petitioning creditors. *See* 11 U.S.C. § 303(i)(2). So the lack of bad faith, by itself, does not immunize petitioning creditors from an award of fees and costs. However, the presence or absence of bad faith is relevant in the exercise of the court's discretion on whether to award fees and costs. *See e.g., Reid*, 854 F. 2d at 160.

In sum, applying the fourth factor, the Court concludes that the motivation and objectives of the Petitioning Creditors in the filing the Involuntary Petition against Clean Fuel2 were reasonable, appropriate, and in good faith. As a result, this fourth factor weighs against the presumption that attorneys' fees and costs under § 303(i)(1) should be awarded to Clean Fuel2.

### 5. *Other Material Factors and Considerations*

Finally, in determining whether attorneys' fees and costs should be awarded to Clean Fuel2, the Court considers the following additional factors to be material under the totality of circumstances test.

15

The attorneys' fees requested by Clean Fuel2 are comprised of legal services rendered by both Mr. Brown and Mr. Harrington. Mr. Harrington, however, testified at the trial on the Involuntary Petition as a fact witness in his capacity as Manager of Clean Fuel2. Mr. Harrington did not serve or appear as an attorney of record for Clean Fuel2 in this bankruptcy case. As a result, any award of attorneys' fees for services of Mr. Harrington would seem inappropriate and unreasonable.

Mr. Brown's legal services make up the majority of the attorneys' fees requested by Clean Fuel2. Although Mr. Brown served as the attorney of record for Clean Fuel2 in this bankruptcy case, Mr. Brown was simultaneously wearing several other hats. Mr. Brown is an officer of Clean Fuel2, an owner of Clean Fuel2 (through Clean Fuel1), and had his law office in Vinton, Texas at Clean Fuel2's place of business (which was subleased by Clean Fuel2 from ELH).[16] Mr. Brown does not have a written engagement letter for legal services with Clean Fuel2. Clean Fuel2 has not paid Mr. Brown for any legal services.

The Court believes that any award of attorneys' fees in this case would operate more as a personal reward to Mr. Brown (and Mr. Harrington) than to recompense Clean Fuel2 for any harm that Clean Fuel2 actually sustained from the Involuntary Petition. Clean Fuel2 has not truly incurred the expense of any attorneys' fees in this bankruptcy case—Clean Fuel2's attorneys are really its owners and officers who are engaged in a blood feud with minority member Trucknology (controlled by ELH principals). This feud has spilled over to this Court, but has been pending in several other courts, and seems to elucidate the personal agendas of these attorneys-owners-officers of Clean Fuel2.

Whether such agendas are justified or not is beyond the scope of and record in this bankruptcy case. What is clear from the record in this bankruptcy, however, is that CleanFuel2 has not suffered any real attorneys' fees expenses from the filing of the Involuntary Petition, and that the Court should exercise its discretion in this particular case by not awarding attorneys' fees and costs to Clean Fuel2.

In sum, the Court concludes that these other material factors weigh against the presumption that attorneys' fees and costs under § 303(i) should be awarded to Clean Fuel2.

## V.
## CONCLUSION

In a Reversal of Fortune,[17] the Court finds that the Petitioning Creditors have overcome the rebuttable presumption that attorneys' fees and costs should be awarded to Clean Fuel2 on its Counterclaim under § 303(i)(1) of the Bankruptcy Code. Based on the particular (and somewhat peculiar) facts and circumstances in this unsuccessful

---

[16] The Court is not casting aspersions on Mr. Brown (who at all times conducted himself professionally), the Court is merely stating the facts as presented.

[17] REVERSAL OF FORTUNE (Sovereign Pictures 1990) (Academy Award for Best Actor).

involuntary bankruptcy case, the Court determines that the Counterclaim filed by Clean Fuel2 against the Petitioning Creditors should be denied.

For the reasons set forth in this Opinion, the Court will enter a separate Order denying the Counterclaim (dkt# 55) filed by Clean Fuel2 against the Petitioning Creditors.

###